## UNITED STATES v. SHAW.

### (District Court, D. Kentucky. November 27, 1893.)

CRIMINAL LAW—NEW TRIAL—DISCHARGE OF JUROR.
 While one charged with a misdemeanor may by consent waive a full jury, yet the discharge of a juror by consent of counsel in defendant's absence, of which he is not informed, and which he fails to notice at the trial until the polling of the jury after the verdict, gives him a right to a new trial.

At Law. Indictment of W. P. Shaw for violation of section 11 of the act of January 16, 1883, forbidding the solicitation of contributions for political purposes from government employes. Supp. Rev. St. (2d. Ed.) p. 395. The defendant, having been tried and convicted, entered a motion for a new trial. Motion sustained, and new trial granted.

George W. Jolly, U. S. Atty.
A. E. Willson, C. H. Gibson, and B. Vance, for defendant.

BARR, District Judge. We have considered with care the 21 grounds filed November 4th by defendant for a new trial, but do not think they present any good reason for the granting of a new trial. The additional ground tendered by the defendant, through his original counsel, on the 11th instant, and allowed to be filed on the 17th instant, with the affidavit of defendant, is important, and needs to be carefully considered and determined. That ground is as follows, viz.:

  "United States, Plaintiff, vs. W. P. Shaw, Defendant.
   "Motion of Defendant for a New Trial.

 "Defendant files his affidavit, and moves the court and prays the court to grant him a new trial because of the discharge of Theophilus Pendleton, one of the jury, before the verdict, and during the trial, and moves

the court to arrest judgment, and not to pronounce nor enter judgment against defendant upon the verdict of eleven jurors herein.

"Augustus E. Willson, of Counsel for Defendant."

The affidavit of defendant states, in substance, that the written consent which his counsel gave the court for the discharge of Mr. Pendleton, one of the jury, was without his knowledge or consent, and that he had no information or knowledge of the fact that the jury only consisted of 11 men until the trial was finished and the verdict rendered, and that the first knowledge or information of the fact was when the jury was polled after the return of the verdict of "Guilty." This statement was of such a character that the court thought it proper to hear further evidence upon the question of the defendant's want of knowledge or information of the absence of the juror Pendleton, and both sides were invited to introduce oral evidence upon the subject, and did so. On this investigation it was shown substantially as follows, viz.:

A jury of 12 men were selected and sworn to try defendant on Saturday, October 21, 1893. The selection was completed about 2 o'clock P. M. of that day, and some evidence heard, when the jury was excused until Monday morning, October 23d. On the morning of Sunday, October 22d, Mr. Pendleton, one of the jury, received a telegram from home stating that his wife's mother was dying, and that he should come home. He, upon the receipt of this telegram, made application to the judge to be excused and discharged, and this application was submitted to the counsel of the defendant by Judge Barr, and resulted in this written consent being handed to him, viz.:

"4,664.        District Court of the United States, District of Kentucky.

"United States vs. W. P. Shaw.

"We hereby consent and agree that the court may discharge Theophilus Pendleton, one of the jurors in this action, and that the trial now pending may proceed before the remaining eleven jurors with the same force and effect as if said juror had not been discharged: provided, however, that this consent, made for humanity, because of the news that said juror's wife's mother is dying, shall not be construed nor treated as a waiver of any other objection, exception, or other matter of defense which may or might be made, had, or taken if this consent had not been made or given, or if the trial had proceeded with the complete jury.

"Charles H. Gibson,
"Augustus E. Willson,
"Burton Vance,
"Attorneys for Defendant."

Mr. Willson, when he delivered this writing to the judge, stated he desired to see Mr. Shaw, and had been unable to find him. Mr. Jolly was absent from the city, and hence his consent could not be obtained; but, as the matter was pressing, Judge Barr assumed to act for him, and discharged the juror Pendleton in the presence of Mr. Willson. The next morning, Monday, after court had been opened, the judge informed the district attorney that one of the jurors had been excused, and the reason therefor, and he approved it. This was done while the court was in session, and immediately after the opening, but not publicly. About the same time, and im-

mediately after, Mr. Willson came up to the bench, and suggested to the court that no record be made of the absent juror, and that the case proceed as if the 12 jurors were present. This plan was accepted by the court, and the trial proceeded without any formal consent being entered, or, indeed, any record at all being made of the absence of Mr. Pendleton.

The district attorney proved by the deputy marshal and others that the jury sat in twelve chairs to the left of the bench, in two rows,—six in each,—and that they sat separate and apart from all others, and that one of these chairs remained vacant all of Monday, during the trial, within eight or ten feet from the defendant, who remained in court during the entire trial, which continued three days, seated from the jury about that distance. He also proved by several witnesses they noticed as soon as they came in the court room the absence of one of the jury, and made inquiry about it. The defendant swore that he did not observe the vacant chair, nor that there were only eleven jurors, and that he had no knowledge or information that one juror had been excused, or that there were only eleven jurors trying him; that his counsel did not tell him of the agreement or consent they had made, nor did they give him any information upon the subject; and that his first information or knowledge upon the subject was when the jury was polled after the verdict, and one of the jurors did not answer to the rollcall of the clerk. Both Mr. Willson and Mr. Vance state they did not inform the defendant of the agreement which was made to excuse one of the jury, nor did they inform him that one of the jurors had been excused, or that there were only eleven jurors trying him; and, as far as they knew, he had no information upon the subject. Mr. Gibson was out of the city when this matter was investigated, and did not testify, but we should not draw any inference from this against defendant. Mr. Willson not only confirmed defendant in his statement that his counsel did not inform him of the consent they had given, but stated his reasons therefor, as will be seen from these extracts from his statement, viz.:

"We came here, and I told the judge, frankly, that we had not been able to find our client, and suggested that the matter go on, and the absence of the juror be ignored; that would be the best way. My idea was not to pay any attention to it. I did intend to speak to Shaw the next day about it. There was no question of bad legal faith. I did not think of the Goldsmith Case at the time. The court had begun when I came in. I am not positive of that. But I know it didn't occur for me to speak to Shaw the next morning, and it didn't occur for me to speak to him the next day, or the next day; and I finally decided not to mention it, because I had suggested the policy of ignoring the absent juror. If Shaw had asked me anything about it, I would have told him the whole circumstances. My conviction was that probably the trial would go through without the absence of the juror being noticed. I was very much worried about the matter, and made a great many resolutions to myself never to make agreements without seeing my client. I felt that I had made a mistake, which was an injustice to Shaw. I had acted according to the light I had at the time, with no possible purpose or thought. At the time of the agreement, I had no idea of it being grounds for a new trial. The question was whether it was best for Shaw to run the risk of having one less juror to have to agree against him. I didn't mention the matter to Shaw until after the poll of

the jury developed the fact that one did not answer, and he asked me about it, and I hurriedly explained it to him. * * * Question by the Court: You said on Sunday, and then on Monday, that it was not worth while to make a note of it? A. I know that was my idea of the best way to reach it. Q. In that connection, did it not occur to you,—the propriety of your calling Shaw's attention to the matter? Shaw was here when you made the suggestion on Monday? A. I really did not notice about Shaw. It seemed to me this: that if I mentioned the matter to Shaw, and he asked me the legal effect, I would have to look the whole matter up and tell him, and I was in doubt and worried about the matter. I was not afraid or ashamed of his criticism, but the question in my mind was this: that it is very difficult for a lawyer to explain offhand the effect of a thing like this, and I thought, if I told Shaw, he would want to know all about it, and I should have to study up the whole thing. We had taken more liberty in signing the paper than I thought we ought. I was not dead sure that a lawyer should do that, but the humanity of the case had governed me, and it was very likely I brought that matter up again before your honor Monday morning; that is, the matter of ignoring the absence of the juror entirely. I know I thought that was the best thing not to mention it. I know I did not mention matters to Shaw, and I know I deliberated whether it was best to mention it to him or not. By Mr. Jolly: Do I understand that you mentioned this matter Monday morning to the court? A. I did. I made the suggestion Sunday, possibly, and then Monday, that the absence should be ignored; that the paper should be preserved. I don't remember how much I reasoned about telling Shaw, but I know I thought telling Shaw would not bring it back. I had made no examination of the authority except that I knew generally about that New York case—Cancemi Case. I do not know that I remember that now. Of course, I had heard of the Goldsmith Case."

Although it would seem to be most probable, from the defendant's close proximity to the jury, continued for three days, and the strong professional obligation of his counsel to inform him of so important a fact as the excusing of a juror who was trying him for a serious offense, yet this probability—strong as it should be in the minds of all intelligent men familiar with court trials—is, we think, more than counterbalanced by the sworn, direct statements of the defendant himself, and that of his counsel, Messrs. Willson and Vance. Hence, his motion for a new trial should be considered as if Mr. Pendleton, the juror, had been excused by order of court, and with the consent of district attorney and the defendant's counsel only, and without defendant's knowledge, consent, or subsequent ratification.

The sixth amendment to the federal constitution declares that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed;" and, in the seventh amendment, that "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

These provisions are limitations upon the power of the United States, and a guaranty to the citizen of the right to a jury trial, but it is not an abridgement of, or a limitation of, the right of a citizen to waive a jury trial. It is conceded that by jury is meant a common-law jury, of 12 qualified persons, and it may also be admitted that, in crimes where the punishment might be death, the accused could not, at common law, waive a jury of 12 persons, and

try with a less number. This was, we think, because, at common law, and under the present law, life, being the immediate gift of the Creator, could not legally be disposed of or destroyed by any individual, neither by himself nor by any other of his fellow creatures, merely upon their own authority. 1 Bl. Comm. p. 133. Many of the cases where the right of the accused to consent to the discharge of a juror is denied were those where the accused was being tried for murder, and there might be capital punishment. See Cancemi v. People, 18 N. Y. 128; Territory v. Ah Wah, 4 Mont. 149, 1 Pac. 732; Hill v. People, 16 Mich. 354.

In the case under consideration, the offense charged, of which the defendant has been convicted, is declared by the statute to be a misdemeanor; and had the juror Pendleton been discharged by the court with the consent of the defendant, we are of the opinion that both reason and the weight of authority would have sustained the action of the court, and the discharge would not have been a legal ground for a new trial. See Tyra v. Com., 2 Metc. (Ky.) 1; State v. Kaufman, 51 Iowa, 578, 2 N. W. 275; Com. v. Dailey, 12 Cush. 80.

The case of Com. v. Dailey, 12 Cush. 80, was decided by Chief Justice Shaw, and is an able and elaborate opinion, and successfully answers all the arguments against the right of a person charged with a misdemeanor from waiving a jury of 12 persons, and trying with 11 jurors. In that case the juror was withdrawn at the request and by the consent of defendant's counsel, on account of the illness of the juror's father. The defendant was present at the time, but said nothing, nor did his counsel consult with him, but after the verdict he filed a motion in arrest of judgment. This case, seemingly, is an authority to sustain the right of counsel to give the consent which was given here; but a careful reading of the opinion satisfies me the court assumed that as the accused was present, and remained silent, he consented to the action of his counsel.

Here the consent was given, not in open court, in the presence of the accused, but in his absence, and, according to the weight of the evidence, without his consent or knowledge then or thereafter. The right to bind the defendant by this consent must therefore exist, if at all, by reason of the relation of that of attorneys employed to defend him. I have seen only two cases upon this point, and they are against such an authority. See State v. Wamire, 16 Ind. 357, and Brown v. State, Id. 496. In case of State v. Wamire, the accused was not present in court when his counsel gave consent to the discharge of the jury without a verdict, when there was no imperious necessity therefor. The court stated that this could not be done by the counsel alone, without giving any reason. In the case of Brown v. State, reported in same volume, (page 496,) the counsel waived a trial by a jury of 12 men, and agreed to a trial with a less number. The defendant was present in court, but it appeared by his affidavit that he was not consulted, and did not know he could object to the act of his attorney. The court held that this waiver was not sufficient, and did not bind the defendant. The court, in this case, as in the other, gave no reason for its decision.

It seems to me the question is one of agency, and that while the attorney may be presumed to have, and does have, authority to act for his client in many matters pertaining to a trial, in criminal trials he does not have authority to waive a trial by a jury of 12 men, and accept a less number, especially when it is affirmatively shown the client was without any knowledge or information of the action of his attorneys, and was kept in ignorance of it until the verdict was rendered against him. It does not at all affect defendant's legal right that the court was misled, and that, had his counsel informed him of their consent, and he had objected, and his objection been made known to the court on Monday morning, the jury could have been legally discharged, and the case continued, because of illness in this juror's family, or the trial been delayed until the absent juror had been sent for and returned. Nor does it matter, on this motion, that the defendant's counsel seem to have forgotten their professional duty to him, in thus keeping him in ignorance of this consent during his entire trial. Their sense of duty, however, revived at an opportune time, and we think they have succeeded in presenting for their client a valid ground for a new trial.

I conclude that, upon a preponderance of the evidence, the defendant did not know of or ratify the change which was made in his trial jury, and is entitled to a new trial; and his motion for a new trial will be granted, and it is so ordered.